UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Pavel Ignatenkov,              :    Case No.1:11-cv-232
                                :
     Plaintiff,            :
                                :
vs.                         :
                                :
U.S. Foodservice, Inc.,     :
                                :
     Defendant.            :

**ORDER**

Before the Court is the Defendant's motion for summary judgment.  (Doc. 17)  Defendant seeks entry of judgment on Plaintiff's claims of national origin discrimination, FMLA retaliation, and wrongful discharge, arising from Defendant's December 2009 decision to terminate Plaintiff's employment.  The motion is fully briefed and ready for decision.  For the following reasons, the Court will grant Defendant's motion.

**FACTUAL BACKGROUND**

Pavel Ignatenkov was born in the former U.S.S.R.  He is a lawful permanent resident who is in the process of applying for citizenship.  U.S. Foodservice ("USF") is a national wholesale food distributor with a division in Cincinnati, Ohio.  Ignatenkov was hired by U.S. Foodservice in 2004 as a "selector," working on the night shift.  A selector's duties include filling USF's customer orders by "selecting" products stored in the warehouse, and packing pallets of the products for customer delivery or

-1-

pickup.  The job also includes packing and unpacking trailers parked at the warehouse loading dock.  The selectors use a pallet jack, a machine that permits the driver to pick items from the shelves and to stack and move pallets.

During the relevant time period, John Lee was USF's night warehouse manager.  Several floor managers reported to Lee and directly supervised the shift employees.  In August 2008, Ignatenkov wrote a memo documenting an incident involving Lee.  According to his written description (Ignatenkov Dep. Ex. 1), the warehouse was extremely busy one night, and Ignatenkov and at least one of his coworkers found it difficult to keep up with moving the packed pallets into trailers.  At the end of the night, he and his coworker had not finished loading trailers.  At the end of their shift, Lee called them aside and started screaming at them both, telling them they had to work faster, and to clock out "and get the f*** out of here."  Lee threatened that they would be fired if it happened again.  In his written memo, Ignatenkov accused Lee of being unprofessional, stating that he did not treat Ignatenkov and his coworker with respect.  Ignatenkov believes that he submitted this written complaint to Christa Bishop, USF's human resources manager.  (Ignatenkov Dep. at 133)

Ignatenkov described two other incidents of harassment at work.  In February or March 2009, he testified that one of the

night floor managers, Robert Martin, approached him and dragged him off his pallet jack, screaming at him and pulling him towards the door. Martin eventually calmed down, and he did not drag Ignatenkov out of the warehouse. It is unclear what may have precipitated this incident; Ignatenkov reported the incident to another floor manager, Andre Hinton, who told him that it was not necessary to lodge a formal complaint. Another time, Ignatenkov said that a co-worker punched him in the back while he was on his pallet jack. He also asserted that a coworker, James Bradford, hit his pallet jack with his own jack in November 2009.

USF maintained an "open door" complaint policy, under which employees were encouraged to communicate complaints and concerns to management. In July 2009, Ignatenkov submitted a list of complaints to Michael Klein, USF's president, and to Bishop, attaching a copy of his August 2008 report of the incident involving Lee. His new complaints were primarily about his shift assignments, his pay, and some concerns about seniority and the assignment of certain job tasks. There is no mention in his memo about anything concerning national origin discrimination or any FMLA problems. Klein and Bishop met with Ignatenkov to discuss his concerns, and they began investigating his complaints. Bishop was tasked with looking into several specific items, and she wrote some notes on a copy of Ignatenkov's memo. Bishop sent a copy that included her own notes to Andrew Virzi, who was USF's

-3-

VP of Operations and Lee's supervisor.  Virzi apparently printed a copy of the document for himself, but failed to retrieve it from a printer in the warehouse.  Ignatenkov discovered that a few employees had seen his written complaint, as one of his coworkers showed him the document.  He immediately sent an email to Bishop and Klein, expressing his anger over the fact that his complaints were not kept confidential.  (Klein Dep. Ex. 1)  Klein and Bishop again met with Ignatenkov, who was understandably upset that his communications with them had been seen by his coworkers.  Klein apologized to him, and they continued to investigate his concerns.

Ignatenkov developed pneumonia in October 2009, and was approved for a two-week FMLA leave.  When he returned to work later in October, he testified that he returned to the same job at the same rate of pay.  He admitted that no one at USF discouraged him from taking leave, either in October 2009 or on several prior occasions when he was approved for leave for various reasons.

On December 9, 2009, Ignatenkov was working his shift and driving his jack trying to complete an order.  He encountered another employee, Pamoussa Sawadogo, in Aisle 80 of the warehouse.  Sawadogo is originally from West Africa, and he has some difficulty understanding spoken English.  According to Ignatenkov, he asked Sawadogo to move his jack and pallets out of

-4-

the way so that Ignatenkov could pass him.  When Sawadogo responded slowly, Ignatenkov told him to get his "f***ing boards" out of the way.  Sawadogo began to move some pallets, but Ignatenkov believed the aisle was still blocked.  According to Ignatenkov, he then used his own pallet jack to gently push the pallets out of his way.

James Bradford, another selector working that shift, approached Robert Martin, saying he witnessed Ignatenko's encounter with Sawadogo.  Bradford reported that Ignatenov was bullying Sawadogo and being very aggressive.  Martin reported the incident to Lee, who then talked with Sawadogo and Bradford separately.  Bradford told Lee that he saw Ignatenkov run into Sawadogo's jack, at which point Ignatenkov got off his own jack, approached Sawadogo, and "got in his face."  Lee asked Bradford if he wanted to write a statement, and Bradford did so.  Bradford wrote that he and Ignatenkov were blocked from moving through Aisle 80, and that Ignatenkov "... instantly started cursin [sic] and threatening, calling Sawadogo out of his name, then he violated his personal space by getting in his face and belittling a nonconfrontational person even more.  Then moved his skids and knocked his skids over. ... This offended me as a human being and as a co-worker of Sawadogo. ..."  (Bishop Dep. Ex. 2)  Sawadogo confirmed much of Bradford's account of the incident; according to Lee, Sawadogo was almost crying and told Lee that he felt

threatened by Ignatenkov.  Lee asked him to write a statement; he
wrote that he had moved his first pallet out of Ignatenkov's way.
But then Ignatenkov began to "talk to me like his baby," drove
into his pallets and knocked them over.  He described restacking
the products, and stated "So, I'm a negro or due to my mask I
look like a monkey, anyway I try to do my job, this is my
concern.  I think a flour [sic] is beautiful because we can see
different colors.  And the world is to compare to a flour, of
course its different races.  I like to make friendship but not to
threat someone like he did me today."  (Sawadogo Dep. Ex. 1)

Lee then called Ignatenkov to the office and suspended him
pending an investigation of the incident.  Lee also reported the
incident by email to Bishop, Klein, and Virzi, telling them that
he suspended Ignatenkov until an investigation was done.  Lee
also stated: "I feel we should terminate this is a clear case of
workplace violence."  (Virzi Dep. Ex. 19)  Ignatenkov immediately
called Klein and reported his suspension, and Klein assured him
that USF would investigate.

Later on the morning of December 10, Ignatenkov sent an
email to Bishop and Klein (with a copy to his attorney), stating
that "Since I came back from my FMLA leave, I am experiencing the
following problems that are harassment and discrimination."
(Ignatenkov Dep. Ex. 4)  The first three items on his list dealt
with aspects of his pay and bidding for certain jobs; the fourth

-6-

item asserted that he had never been trained to operate a PIR
machine and forklift.  The fifth item was a complaint about his
suspension; he told Bishop and Klein that the "problem" was
caused by Sawadogo.  He denied using bad language, and accused
Sawadogo of being one of the worst workers on the night shift.
He told Klein and Bishop that Lee had caused him numerous
problems over the last year or more, including his suspension
which he characterized as "attempting to fire me over everyday
work routine."  (Id.)

Bishop undertook an investigation of the incident, and spoke
separately to Bradford and to Sawadogo.  Sawadogo told Bishop
that when Ignatenkov hit his pallet, Ignatenkov got off his lift
and called Sawadogo a "f***ing idiot" and other things that he
did not understand.  He told Bishop that Ignatenkov used the term
"nego," "nigger," or "negro" during his tirade, that he talked
down to him, and that he felt Ignatenkov was making fun of him.
In his deposition, Sawadogo said that Ignatenkov was very angry
with him, and believed that Ignatenkov deliberately hit his
pallet, cursed at him, used a racial slur and called him a
monkey.  Bradford confirmed his written statement when he spoke
to Bishop, explaining what he meant when he wrote that Ignatenkov
called Sawadogo "out of his name."  (Bishop Dep. Ex. 2,
Bradford's written statement.)  He explained to Bishop that he
meant that Ignatenkov used a racial slur, "nigger."  Bradford

-7-

told Bishop that Ignatenkov was very confrontational, and violated Sawadogo's personal space.  Bradford approached Sawadogo after the incident to ask if he was alright, and he told Bishop that Sawadogo was very upset and looked as if he was going to cry.

Bishop also met with Ignatenkov, asking his version of the incident.  Ignatenkov admitted that he got off his jack and approached Sawadogo, telling him to move his f***ing boards.  He also admitted that he used his pallet jack to move Sawadogo's pallet.  Ignatenkov denied using racial slurs, and denied that he intentionally knocked over Sawadogo's pallets.  He admitted in his deposition that he "overreacted" and that he had used profanity.

Bishop then met with Klein, Virzi and Lee about a week later, and recommended that Ignatenkov be fired for violating USF's policies against workplace violence.  That policy states that USF "will not tolerate any actions, statements or other behavior by anyone that is, or is intended to be, violent, threatening, intimidating, disruptive, aggressive or harassing, as determined by the Company in its sole discretion.  This means the Company will take appropriate action, up to and including termination of employment, in response to such conduct."  (Bishop Dep. Ex. 12, at CM/ECF PAGEID 386) Ignatenkov was terminated on December 18, 2009.

Ignatenkov filed a claim with the Ohio Civil Rights Commission on September 22, 2010, and received a right to sue notice in January 2011. He filed his complaint in this case, alleging national origin discrimination under Title VII and Ohio Rev. Code 4112.02A; retaliation under Title VII and Ohio law, alleging that his termination was in retaliation for complaining about national origin discrimination; a state law claim for wrongful discharge in violation of public policy; and claims for FMLA interference and retaliation. USF seeks summary judgment on all of Plaintiff's claims. Ignatenkov does not dispute the dismissal of his FMLA interference claim, but argues that genuine disputes of material fact preclude entry of judgment on the rest of his complaint.

**ANALYSIS**

1. <u>Summary Judgment Standards</u>.

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that

-9-

there is a genuine issue for trial.'" <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986) (internal quotation omitted).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. <u>Guarino v. Brookfield Township Trs.</u>, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. <u>Anderson</u>, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Electric Industries Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor. <u>United States v. Diebold Inc.</u>, 369 U.S. 654, 655 (1962).

The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 249. The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Id</u>. at

-10-

250. "If the evidence is merely colorable, ... or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

2. <u>National Origin Discrimination and Retaliation</u>.

Ignatenkov's state law discrimination and retaliation claims are analyzed under federal law applicable to his Title VII claims, and they will be addressed together. See <u>Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Commission</u>, 66 Ohio St.2d 192, 196 (Ohio 1981).

Ignatenkov does not offer any direct evidence of discriminatory treatment based on his national origin, and so the familiar <u>McDonnell-Douglas</u> burden-shifting framework applies. To establish a prima facie case of national origin discrimination, Ignatenkov must show: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) he was qualified for his job; and (4) he was treated differently than similarly-situated, non-protected employees. <u>Younis v. Pinnacle Airlines, Inc.</u>, 610 F.3d 359 (6th Cir. 2010); <u>Wright v. Murray Guard, Inc.</u>, 455 F.3d 702, 707 (6th Cir. 2006). USF does not contest the first three factors, but argues that Ignatenkov has not shown that he was treated differently than similarly-situated employees who violated USF's workplace violence policy.

"Similarly situated" does not require a showing that the individuals are "identically situated." What is required is that

-11-

Ignatenkov demonstrate that the two employees are similarly
situated in relevant aspects.  Ercegovich v. Goodyear Tire &
Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998).  It is plaintiff's
burden to show that the conduct of these employees was comparably
serious to his own.  Ignatenkov cites an incident involving two
non-Russian co-workers, Abdoulaye Tambdou and Sidi Traore, that
occurred after Ignatenkov's termination.  According to Lee's
email to Virzi and Bishop about this incident (Doc. 26, Ex. A),
Traore reported to Lee that Tambdou "slammed him to the floor,"
and that another employee (Samba) witnessed the altercation.  Lee
then spoke to Samba, who reported that he had seen them with
their hands on each other, and that Sidi "went to the ground and
Tambdou fell on top of him."  Samba did not see who started the
incident, and could not hear anything being said.  Lee
interviewed Tambdou and Sidi; Tambdou admitted touching Sidi, but
Sidi denied putting his hands on Tambdou.  Bishop placed both
employees on three-day suspension and gave them each a final
warning.

Ignatenkov also relies on an incident involving Dewayne
Dobbs, another night shift employee, who brought a handgun to
work in August 2011.  Dobbs was not suspended or terminated,
although having a gun on USF premises is a clear violation of the
workplace violence policy.  Dobbs received a final written
warning from USF's then-Vice President of Operations, Jeff

-12-

Coppenger (Doc. 26, Ex. B).  The warning states: "Prior to clocking in for the start of your shift ..., you went straight to Kevin Giffin to inform him that you were carrying a handgun.  You also informed Kevin that you are licensed to carry in the State of Ohio.  We appreciate your honesty and effort to come forward, but need you to understand the serious nature of this incident."  Coppenger told Dobbs that any further incidents "will result in further disciplinary action up to and including termination of your employment...".  Dobbs wrote on the bottom of this notice, "I understand my wrong doing, and I apologize for it."

Ignatenkov also contends that he was the victim in three incidents of workplace violence, and that USF took no actions against the perpetrators.  He cites the August 2008 incident involving Lee, and the incidents involving Martin and his co-worker described above.  He also attached an affidavit to his response to USF's motion providing additional details about the incident with Bradford in 2009, stating that Bradford "deliberately ran his pallet jack into my pallet jack."  He states that he reported that incident to a floor manager, who told him to "get over it."  He also complained to Virzi, but Virzi failed to check the security cameras in the area to find out what happened.  The incident ended when Lee told the entire staff the next day to "be more careful."  (Doc. 26, Ex. 2)

USF responds that there is no evidence that Ignatenkov

-13-

reported the incidents involving his coworkers to management when they occurred. His July 2009 written memo to Bishop and Klein states that unnamed coworkers grabbed him or threatened him, but he admitted that he refused to identify these individuals when Bishop asked him about the incidents during his meeting with her in the summer of 2009. Bishop testified that because he refused to identify the individuals, she questioned supervisors about whether they could recall such incidents, and none of them could do so. Ignatenkov suggests that Bishop should have done more, questioned more people or even all of the shift employees to try to identify who might have been involved. Given his refusal to identify the alleged culprits and the passage of time, Bishop believed that it would not be productive, and that it was unrealistic to question each employee about incidents that occurred some months before.

Regarding the alleged similarity of the incident in which Dobbs brought a gun to work, USF points out that Dobbs **voluntarily** disclosed his weapon to his supervisor at the start of his shift. There was nothing about the incident suggesting that any threats or violence were involved, and there was no altercation with anyone: Dobbs admitted he was carrying the gun, and accepted full responsibility for his action. And with respect to the altercation between Traore and Tambdou, Bishop explained that they told conflicting stories about what had

-14-

happened and who initiated the altercation.  There is no reference to either of them trying to "strangle" the other, as Ignatenkov suggests.  The only witness to the incident, Samba, told Bishop that he was too far away to see or hear what precisely took place.  He described that he saw the two standing close together, and that they appeared to be "holding hands," but he denied seeing either of them hit the other.  As Bishop was unable to determine which of them was the instigator, and because the only witness was unable to confirm either of their stories, she decided to issue both of them warnings and suspend them.  But in Ignatenkov's encounter with Sawadogo, a witness (Bradford) first reported the incident, and he told Bishop that he saw Ignatenkov approach Sawadogo, "get in his face," and use a racial slur.  Bradford corroborated Sawadogo's version of what had happened.

Moreover, Bishop identified other individuals who violated the workplace violence policy and who were terminated as a result.  She testified that an employee named Bentancourt had a verbal altercation with another employee in the parking lot; even though there was no physical contact between the two, Bishop decided to terminate both of them.  She also described an incident with an employee named Fall, who got into a heated verbal exchange and "chest bumped" another employee; Fall was terminated as a result.  None of these employees had complained

about discrimination or workplace safety, and none were Russian or born in the former Soviet Union.

USF cites <u>Romans v. Mich. Dept. of Human Servs</u>., 668 F.3d 826 (6th Cir. 2012), where the plaintiff alleged that other employees violated workplace policies against harassment and use of foul or abusive language but were not terminated, and citing incidents in which coworkers harassed him.  The court noted that the incident for which plaintiff was disciplined was substantiated by a witness, while the incidents cited by the plaintiff were not.  The same is true here: Ignatenkov claims that a coworker hit him or hit his pallet jack, but there is nothing to substantiate these claims, or to suggest that the incidents involved intentional aggression rather than an accident.

Moreover, in <u>Clayton v. Meijer, Inc.</u>, 281 F.3d 605 (6th Cir. 2002), the plaintiff was discharged after violating a company rule requiring a truck driver to be sure that the rear door of the trailer was firmly closed and the dock plate raised before leaving the loading dock.  Plaintiff's failure to check his door and the plate resulted in a serious injury to a coworker. Plaintiff was African-American, and produced evidence that two white drivers violated the same rule but were not terminated. The court held that while all three engaged in similar conduct, and were perhaps guilty of the same degree of negligent conduct,

-16-

only plaintiff's violation had resulted in injuries to a
coworker.  The harm resulting from a rule violation was precisely
the sort of "differentiating or mitigating circumstance" that
distinguished plaintiff's conduct from the white employees'
conduct, and the employer's more severe treatment of the
plaintiff did not give rise to an inference of discrimination.
Id. at 612.  That situation also applies here.  Ignatenkov's
complaints about his coworkers hitting him or his pallet jack did
not involve the use of racial epithets or demeaning words and
conduct based on his race or national origin.  Both Lee and
Bradford described Sawadogo as extremely upset after his
encounter with Ignatenkov, to the point that he was crying when
Lee saw him that evening.

The Court agrees that Ignatenkov has not shown that he was
treated differently in a relevant manner than similarly-situated
employees were treated by USF, and therefore has not shown a
prima facie case of national origin discrimination.

Ignatenkov also claims that USF retaliated against him and
fired him because he complained about discrimination.  A prima
facie case of retaliation requires Ignatenkov to establish: (1)
he engaged in Title VII-protected activity; (2) USF knew that he
engaged in that protected activity; (3) USF subsequently took an
adverse employment action against him; and (4) the adverse action
was causally connected to his protected activity.  See Ladd v.

-17-

Grand Trunk W. R.R., Inc., 552 F.3d 495, 502 (6th Cir. 2009).

USF argues that Ignatenkov has not shown that he engaged in any protected activity. There is no evidence that he ever complained to Bishop, Klein or Virzi about any national origin discrimination, either directed at him or at anyone else. He asserts that co-workers called him "f***ing Russian" or "f***ing Communist," but he never reported these incidents to management. His written complaints in August 2008 and July 2009 do not say anything about national origin discrimination or harassment. Ignatenkov did complain about Lee's treatment of him during the August 2008 incident, during which Lee screamed and swore at him. But Lee was treating Ignatenkov **and** his co-worker equally during that incident, belying any reasonable inference of Lee's anti-Russian bias or discriminatory attitude. And Ignatenkov's written complaint about the incident does not complain about any national origin or racial discrimination. Moreover, the only incident he cites that involved his supervisor, John Lee, was his testimony that he walked by Lee's office once and heard him say "f***ing Russian," but did not hear anything else Lee said. (Ignatenkov Dep. at 127) This isolated comment does not support his assertion that Lee, or any USF management personnel, harbored an anti-Russian animus.

USF cites several cases holding that an employee's complaints must be specific in opposing a practice outlawed by

-18-

Title VII (or other anti-discrimination statutes such as the
ADEA) in order to constitute protected activity. See, e.g., Fox
v. Eagle Distributing Co., 510 F.3d 587 (6th Cir. 2007), where a
sales employee told a company customer that management was "out
to get him," and that he had filed a $10 million lawsuit that
"would get their attention." Id. at 589. The court held this
was not protected activity, as it did not oppose any unlawful
conduct by his employer, and noted that "a vague charge of
discrimination in an internal letter or memorandum is
insufficient to constitute opposition to an unlawful employment
practice." Id. at 591. See also, Balding-Margolis v. Cleveland
Arcade, 352 Fed. Appx. 35, 45, 2009 U.S. App. LEXIS 24604 (6th
Cir., November 9, 2009)(unpublished), where plaintiff lodged
several complaints about general work-related issues but said
nothing about discriminatory conduct. She admitted that she
never talked with anyone in management about sexual or age-based
harassment or discrimination, or at least could not recall that
she had ever done so. The court affirmed the summary judgment to
the employer because she had failed to establish a prima facie
case of retaliation. And see, Love v. Elec. Power Bd. Of
Chattanooga, 392 Fed. Appx. 405, 2010 U.S. App. LEXIS 17552 (6th
Cir., August 20, 2010)(unpublished), holding that an employee's
charges that his supervisor and vice president were
confrontational and scared other employees, and that they denied

-19-

his vacation request because they were "out to get him," did not amount to ADEA-protected activity.

Ignatenkov asserts that he complained about "labor law" violations; that his locker was taken away from him; and that he specifically referred to OSHA violations in his post-suspension complaint to Bishop and Klein, all of which constitutes protected activity.  None of these complaints mention national origin discrimination, and no reasonable inference can arise that he was actually complaining about discrimination that is prohibited by Title VII.

USF also contends that without showing that he engaged in protected activity, Ignatenkov cannot demonstrate that USF knew that he had done so, the second step of his prima facie case. The Court agrees that the record amply supports the conclusion that the ultimate decision maker, Bishop, had no knowledge that Ignatenkov had ever complained about national origin discrimination.  Klein, Virzi and Lee who also participated in the final meeting with Bishop, all denied any knowledge of any complaints, and Ignatenkov admitted in his deposition that he knew of no facts suggesting that the complaints he did make were connected to his national origin.  As a matter of logic, therefore, without Title VII-protected activity that was known to the decision makers, Ignatenkov cannot show a genuine factual dispute whether his termination was causally connected to his

-20-

protected activity.  He has therefore failed to establish a prima facie case of national origin retaliation.

But even if Ignatenkov could establish a prima facie case of discrimination or retaliation, USF has offered a legitimate justification for terminating him: the confrontation with Sawadogo, which was a violation of the workplace violence policy. Ignatenkov must then show that this proffered explanation is a pretext.  He can do so by demonstrating that (1) the proffered reason had no basis in fact; (2) the proffered reason did not actually motivate his termination; or (3) the proffered reason was insufficient to motivate his termination.  Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994). Ignatenkov must do more than dispute the facts on which his termination was based; he must show that USF did not "honestly believe" its proffered reason for terminating him:

> In deciding whether an employer reasonably relied on the particularized facts then before it, we do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.  If there is no material dispute that the employer made a reasonably informed and considered decision that demonstrates an honest belief in the proffered reason for the adverse employment action, the case should be dismissed since no reasonable juror could find that the employer's adverse employment action was pretextual.

-21-

Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir. 2001), quoting Smith v. Chrysler, 155 F.3d 799, 807 (6th Cir. 1998) (internal quotations omitted).

Ignatenkov contends that the facts about the incident that Bishop chose to believe are untrue.  He denied using racial epithets and denied that he intentionally hit Sawadogo's pallet. He accuses USF of consciously deciding to ignore his version of the events because it wanted to terminate him for discriminatory, unlawful reasons.  As the Court noted above, Lee testified that Sawadogo was close to tears when he saw him on the night of the incident.  Bradford confirmed Sawadogo's description of the incident to Lee and later to Bishop, telling Bishop that Ignatenkov was very angry, jumped off his pallet jack and approached Sawadogo, yelling and cursing at him using a racial epithet.  Based on her investigation, Bishop concluded that Ignatenkov had used a racial slur and had acted aggressively and in a threatening manner.  Ignatenkov's denials do not raise an inference that Bishop did not honestly believe Sawadogo's report of the incident.  And his denials alone do not establish that USF's proffered reason had no basis in fact, as he admits that the incident occurred and that he overreacted.

The Court also concludes that Ignatenkov has not established a genuine dispute that USF's proffered reason did not actually motivate his termination.  He contends that the other incidents

involving violations of the workplace violence policy that he recites did not result in termination of those employees.  Since USF's policy is one of "zero tolerance," he suggests that the incident with Sawadogo was not sufficient to actually motivate his termination.  The Court disagrees.  As discussed above, the other incidents of which Bishop was informed are substantively different from the incident involving Ignatenkov, and Bishop provided several instances in which employees had been terminated for arguably less serious policy violations.  Moreover, as USF points out, its "zero tolerance" policy does not state or require that any and all violations no matter the degree of seriousness must result in an employee's automatic termination.

Finally, the court concludes that Ignatenkov has not shown that the reason USF gives for his termination was insufficient to motivate its decision.  As noted in <u>Manzer</u>, this type of pretext evidence attacks the credibility of the employer's explanation with evidence tending to show that illegal discrimination was the true cause: "In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  <u>Manzer</u>, 29 F.3d at 1084 (internal citation omitted).  Ignatenkov argues that he protested his coworkers' conduct in calling him a "f*** Russian."  But nothing about this conduct gives rise to a reasonable inference that it is more

-23-

likely than not that he was fired because of his national origin. He never complained to Bishop, Klein or Virzi about any national origin discrimination.  His written complaints in August 2008 and July 2009 do not say anything about national origin discrimination or harassment.  And as already stated above, the only incident involving Lee was too isolated and ambiguous to support an inference that the true reason he was terminated is his national origin.

The Court therefore concludes that USF is entitled to judgment on Ignatenkov's claims of national origin discrimination and retaliation.

3.  <u>FMLA Retaliation</u>.

Ignatenkov alleges that he was fired in retaliation for his exercise of FMLA leave in October 2009.  As noted above, Ignatenkov was granted two weeks leave because he had pneumonia. He admits that when he returned from his leave, he was not disciplined for taking leave, and there was no change in his salary, work schedule, or position.  He also had taken previous leaves without objection from USF, including at least one absence for over a month to assist his mother while she was in the United States.

A prima facie case of FMLA retaliation requires Ignatenkov to show that (1) he exercised his FMLA rights, (2) his employer knew that he had done so, (3) he suffered an adverse employment

action, and (4) a causal link exists between the two events.
Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012).  Only
the last element, causation, is in dispute.  Ignatenkov primarily
relies on the temporal proximity of his leave and his
termination.  He also contends that Bishop failed to investigate
Ignatenkov's complaints after he returned from FMLA leave.

In Lindsay v. Yates, 578 F.3d 407 (6th Cir. 2009), a housing
discrimination claim, the plaintiffs claimed that defendants
terminated their purchase contract within days of discovering
that plaintiffs were African-American.  Plaintiffs argued that
temporal proximity alone was sufficient to establish their prima
facie discrimination claim.  In considering their argument, the
Sixth Circuit analogized to cases discussing temporal proximity
and causation in Title VII retaliation claims:

> Causation can be proven indirectly through
> circumstantial evidence such as suspicious
> timing.  Specifically, this Court has found
> that temporal proximity between an assertion
> of Title VII rights and a materially adverse
> action, is sufficient to establish the causal
> connection element of a retaliation  claim
> "[w]here an adverse employment action occurs
> very close in time after an employer learns
> of a protected activity."  Where the nexus is
> not "very close," we have declined to find a
> causal connection based on timing alone.

Id. at 418-19 (citations and parenthetical explanations omitted).
The required proximity was also described as "acutely near in
time" in DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004),
where an employee filed an EEOC claim and his supervisor

-25-

recommended his termination thirteen days later.  Various periods
of time have been found sufficient.  See, e.g., <u>Mickey v.
Zeidler</u>, 516 F.3d 516 (employee was fired the same day his
employer was notified of his EEOC charge); <u>McNett v. Hardin Cmty.
Fed. Credit Union</u>, 118 Fed. Appx. 960, 965 (6th Cir. 2004)
(employee was terminated thirteen days after meeting with
regulators about his employer's loan accounting practices).

Here, approximately six weeks elapsed between Ignatenkov's
return to work and the incident which resulted in his termination
a week later.  Standing alone, that proximity is insufficient in
this case to give rise to a reasonable inference that there was a
causal link between Ignatenkov's FMLA leave and his termination.
A six-week lapse might be sufficient if Ignatenkov had some
evidence that USF or his supervisors expressed some hostility
because he had taken FMLA leave, or complained about his absence,
but there is not a scintilla of evidence in the record suggesting
that to be the case.  See, e.g., <u>Bryson v. Regis Corp.</u>, 498 F.3d
561 (6th Cir. 2007), where the plaintiff took three months leave
for knee surgery and was terminated on the day she was scheduled
to return.  In addition to the suspicious timing, she also had
evidence from other employees that her supervisor was angry about
her decision to take leave, and that the supervisor "would see to
it that Bryson did not have a job to return to."  Given the
proximity of the events and this evidence of hostility by the

-26-

supervisor who terminated her, the court found that she had satisfied her prima facie burden of proof.  Here, in contrast, six weeks elapsed between Ignatenkov's return from leave and his termination, and there is no evidence of any hostility expressed by anyone about the fact that he took FMLA leave.

Ignatenkov also argues that Bishop failed to investigate his complaints of FMLA retaliation, citing Bishop's deposition testimony at pp. 113-114.  Bishop did <u>not</u> testify that she ignored or failed to investigate any complaints about FMLA retaliation.  As full context of the cited testimony reveals, she was initially asked about Ignatenkov's July 2009 complaints, which had been seen by some of his co-workers; none of these complaints involved an FMLA issue.  Bishop was then asked about Ignatenkov's "complaint" of FMLA retaliation, and she was unable to recall any such complaint or any investigation of any such complaint that she might have done.  She was asked if during the course of the litigation, and responding to the "complaint" **in this case**, she had located any documents or recalled any information about any such investigation, and she responded that she had not found any.  This is a far cry from Ignatenkov's characterization of her testimony, and his accusation that she "failed to investigate" some complaint of FMLA retaliation.  The only time that Ignatenkov mentioned anything about the FMLA was in the memo he wrote on December 10, **after** he had been suspended

-27-

following the altercation with Sawadogo.  (Ignatenkov Dep. Ex. 4)

But even assuming that the temporal connection in this case would be sufficient to satisfy Ignatenkov's prima facie burden on this claim, the Court concludes he has not established a genuine dispute that USF's reason for terminating him was a pretext, and that the real reason for his termination was due to his exercise of FMLA rights in October 2009 or at any other time.  The same analysis set forth above with regard to Ignatenkov's Title VII claims fully applies to his FMLA claim: he has not established a genuine dispute that USF's proffered reason for his termination had no basis in fact, or did not actually motivate the decision, or that it was insufficient to motivate his termination.  He has no evidence that he was treated differently from other employees who exercised FMLA rights and violated the workplace violence policy, or who exercised FMLA rights and violated any USF workplace policies.

4.  <u>Ohio Public Policy Claim</u>.

Ignatenkov also asserts a claim for common law wrongful discharge under Ohio law.  A public policy wrongful discharge claim requires the plaintiff to demonstrate:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).

3. The plaintiff's dismissal was motivated by conduct
related to the public policy (the causation element).

4. The employer lacked overriding legitimate business
justification for the dismissal (the overriding
justification element).

<u>Dohme v. Eurand Am., Inc.</u>, 130 Ohio St.3d 168, 171 (Ohio

2011)(internal quotations and citations omitted).  The clarity

and jeopardy elements are generally treated as issues of law,

while causation and overriding justification elements are usually

questions of fact.  <u>Id</u>., citing <u>Collins v. Rizkana</u>, 73 Ohio St.3d

65, 70 (Ohio 1995).

USF contends that Ignatenkov has not satisfied the "clarity"

element because he has not identified a specific source of law on

which his claim is premised, as <u>Dohme</u> requires.  In <u>Dohme</u>,

plaintiff's job responsibilities included maintenance of his

employer's fire-protection system.  An insurance adjuster visited

the plant to assess the building, and Dohme's employer circulated

a list of employees who were authorized to speak with the

adjuster during the visit; Dohme was not one of the authorized

individuals.  Despite the instruction not to do so, Dohme met

with the adjuster and told him that he was missing reports about

certain fire alarm inspections, suggesting that reports had been

deliberately removed from the company's computer.  When the

employer discovered that Dohme had violated the express directive

concerning contact with the adjuster, Dohme was terminated for

insubordination.

Dohme filed a wrongful discharge complaint, alleging that his employer attempted to prevent him from interacting with the adjuster, jeopardizing workplace safety and exposing employees to danger.  The Ohio Court of Appeals reversed the trial court's judgment in favor of the employer, finding that Ohio had a clear public policy favoring workplace fire safety, and that retaliation against employees who raise fire safety concerns violates that public policy.

The Ohio Supreme Court reversed and held that the employer was entitled to summary judgment.  Dohme's reliance on a general "workplace fire safety" policy was insufficient absent a citation to a statute, regulation, or other specific source of such a policy.  Dohme's reliance on previous Supreme Court opinions generally discussing the basis for other public policy claims was insufficient to establish a specific public policy applicable to his situation.

Here, USF argues that Ignatenkov similarly fails to cite any specific source of public policy.  Ignatenkov relies on his July 2009 complaint that USF was not properly maintaining the pallet jacks.  In his response memorandum, he cites 29 U.S.C. §654, which requires an employer to furnish a workplace "free from recognized hazards that are causing or likely to cause death or serious physical harm to his employees."  The statute further requires employers to comply with OSHA standards.  Ignatenkov's

-30-

complained in July 2009 that he was assigned to the freezer
Monday through Friday, "but I still do not have a palletjack.  I
told John Lee to rebid palletjacks because we have many new ones
that are not assigned to anyone, but it never happened.  Also,
management fails to provide maintenance and necessary repair of
the palletjacks even if you fill out the necessary
forms/paperwork."  (Ignatenkov Dep. Exhibit 2 at ¶4)  His
complaint was about lack of access to a palletjack for his
assigned shift, and his reference to "maintenance and repair" was
clearly set in that context, that he was unable to regularly
secure an operating pallet jack for his use.  This complaint does
not fairly suggest that Ignatenkov was complaining about a
recognized hazard that was likely to cause "death or serious
injury" to USF employees.

　　　Ignatenkov also cites his December 10, 2009 email to Bishop
and Klein, written the day after he was suspended.  He complained
that he was never trained or certified on how to operate the "PIR
machine and forklift," which was against "OSHA regulations" and
"against the law."  (Ignatenkov Dep. Ex. 4)[1]  Bishop asked Virzi
to respond to the December 9 incident, describing her discussions
with Sawadogo and Bradford, and also asking Virzi to comment on
Ignatenkov's December 10 complaints.  Virzi responded that if
Ignatenkov used racial epithets with Sawadogo, it was a clear

---

[1] Ignatenkov also send a copy of his email to his lawyer.

violation of company policy "and a rather severe one, ... not something I feel we can allow."  Virzi also responded to the lack of training complaint:

> The formal training for Pavel was completed.
> Although the formal observation was not
> completed he has been observed by management
> safely operating the PIR equipment.  Pavel
> has some responsibility for operating a piece
> of equipment he hasn't been officially
> approved to operate, but ultimately it is
> management's responsibility to insure this
> doesn't happen, and if OSHA came into
> investigate I think we would get a violation,
> although we can show that we have the proper
> procedures and policies in place to maintain
> a safe working environment.  I think Pavel
> should be terminated for the incident.  Even
> if we would suspend him for 3 days or 5 days
> he could still call OSHA, in fact he may have
> already done so.  I think we would be sending
> the wrong message if we didn't terminate him.

(Virzi Dep. Ex. 21)  Ignatenkov argues that Virzi clearly advocated for Ignatenkov's termination instead of some lesser discipline (e.g., suspension for 3 or 5 days) because he threatened to call OSHA.  Virzi testified that when he wrote this email to Bishop, he believed the incident with Sawadogo as it was described to him was sufficiently serious that Ignatenkov should be terminated <u>regardless</u> of whether he had or would in the future complain to OSHA.  By mentioning the possibility of suspending Ignatenkov, he was not suggesting that his termination had anything to do with OSHA or forklift training.  His email plainly states his belief that the incident with Sawadogo was "not something I feel we can allow," and that "we would be sending the

-32-

wrong message if we didn't terminate him."

Ignatenkov's suggestion that Virzi's email states or implies that he wanted to terminate Ignatenkov due to his reference to OSHA is rather strained.  But even if this post-suspension complaint about training is sufficiently specific to satisfy the clarity element of a public policy wrongful discharge claim, Ignatenkov has not established a genuine factual dispute that this complaint, or his complaint five months earlier about maintenance of palletjacks, caused his termination.  He argues that because this element is generally an issue of fact, it must be reserved for the jury.  The Court disagrees.  In <u>McDermott v. Continental Airlines, Inc.</u>, 339 Fed. Appx. 552, 2009 U.S. App. LEXIS 16955 (6th Cir., July 30, 2009)(unpublished), the Sixth Circuit affirmed summary judgment in favor of an employer on plaintiff's public policy wrongful discharge claim.  Plaintiff alleged that he was fired after lodging several complaints about safety violations by his employer, Continental Airlines.  The employer asserted that the plaintiff was fired because of his involvement with an accident at an airport, and his failure to truthfully admit his involvement to his supervisor.  There was no dispute that plaintiff satisfied the first two elements of his claim: a clear public policy existed in certain FAA and TSA regulations, and he had often complained about violations of those regulations.  With regard to a causal link, the court

-33-

rejected his argument that another employee had been terminated after complaining about safety violations, because the two were not related and were separated by several years.  The court also rejected plaintiff's argument that his supervisor made derogatory comments to him after he appeared on a radio show complaining about an FAA violation.  The court found that the supervisor's comments were directed at the <u>manner</u> in which plaintiff communicated his safety complaints (going on a radio show), and not at the <u>content</u> of his complaint.  Even if the comments were in response to the substance of his safety complaints, they were too isolated to give rise to a causal link, as there was no evidence that the supervisor's comments were related to plaintiff's termination.  Nor could the jury permissibly infer causation based upon the volume of plaintiff's safety complaints over the years; plaintiff's subjective belief that those complaints were the real reason he was terminated was simply insufficient.

The court also held that even if there was some genuine dispute about the causal link, plaintiff lacked evidence of pretext in challenging his employer's proffered justification - his lack of honesty about his involvement in the accident. Plaintiff argued that the process the airline used to confirm his identity was flawed, and suggested that his supervisor was targeting him for termination because of his complaints.  He also

-34-

argued that his supervisor knew that he had no reason to lie about the accident, which suggested that the supervisor lacked an "honest belief" about plaintiff's involvement.  The court reviewed the facts gathered by the supervisor, primarily statements from other employees who were present the night of the accident, to reject plaintiff's arguments.  The court noted that an employer is not required to use an "optimal" investigation process, only that the employer make a "reasonably informed and considered decision," citing Smith v. Chrysler, 155 F.3d at 807. The facts gathered by the supervisor during the investigation substantiated the supervisor's conclusions that plaintiff had been involved and was dishonest in denying his involvement.

Here, the Court must conclude that Ignatenkov had not raised a genuine factual dispute that his termination had anything to do with his complaint about forklift training, particularly in view of the fact that he first raised this issue only after he had been suspended and knew that USF would investigate the Sawadogo incident.  His July 2009 reference to pallet jack maintenance is not only vague in referring to any safety concerns, it was made five months before his termination.

The Court therefore concludes that USF is entitled to judgment on Ignatenkov's state law wrongful discharge claim.

                              **CONCLUSION**

For all of the foregoing reasons, the Court grants

-35-

Defendant's motion for summary judgment.  (Doc. 17)  Plaintiff's

complaint is dismissed with prejudice.

     SO ORDERED.

     THIS CASE IS CLOSED.

DATED: July 18, 2012        <u>s/Sandra S. Beckwith</u>
                           Sandra S. Beckwith
                           Senior United States District Judge